| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:15-CR-207(11) |
| | § | CASE NO. 4:17-CR-221(1) |
| JEROME RUSSELL KELLY | § | CASE NO. 4:17-CR-222(1) |

**MEMORANDUM AND ORDER**

Pending before the court are Defendant Jerome Russell Kelly's ("Kelly") Motion for Compassionate Release/Reduction in Sentence/Home Confinement Due to the Emergency of the COVID-19 Virus (#485) and his Motion for Compassionate Release/Reduction in Sentence Due to the Emergency of COVID-19 (#486) wherein Kelly requests that the court reduce his sentence, place him in home confinement, and/or release him from prison due to the threat of Coronavirus Disease 2019 ("COVID-19").  The Government filed a response in opposition (#489).  United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny the motion.  Having considered the motions, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be DENIED.

I.   Background

On October 27, 2017, Kelly pleaded guilty pursuant to a binding plea agreement to Count 2 of the Fourth Superseding Indictment in Case No. 4:15-CR-207(11), charging him with Conspiracy to Possess with Intent to Manufacture and Distribute Cocaine, in violation of 21 U.S.C § 846.  On January 23, 2018, Kelly pleaded guilty pursuant to a binding plea agreement to Count 1 of the Indictment in Case No. 4:17-CR-221(1), charging him with Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C § 846.  On January 23, 2018, Kelly pleaded guilty

pursuant to a binding plea agreement to Count 1 of the Information in Case No. 4:17-CR-222(1), charging him with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1), 1956(h). The latter two cases were transferred from the United States District Court for the Southern District of Mississippi. On June 1, 2018, the court sentenced Kelly to a total term of 180 months' imprisonment, followed by a 5-year term of supervised release, for all three cases, with all the sentences to run concurrently. Kelly previously filed a Motion for Reduction in Sentence/Compassionate Release (#468) on May 9, 2019, claiming that he had been diagnosed with chronic congestive heart failure and chronic hypertension. The court denied his motion on July 11, 2019, for failure to exhaust his administrative remedies (#470). The court observed, however, that the United States Medical Center for Federal Prisoners, located in Springfield, Missouri ("USMCFP Springfield"), where Kelly is housed, "is a fully functioning medical unit and can accommodate Defendant's medical needs." Kelly's projected release date is June 26, 2029.

II.     Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served

> at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP); *Slate v. United States*, No. 5:09-CV-00064, 2009 WL 1073640, at *3 (S.D.W.Va. Apr. 21, 2009) ("Absent a motion from the BOP, the Court lacks authority to grant compassionate release."). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the

warden received the request.  18 U.S.C. § 3582(c)(1)(A); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, No. 20-5000, 2020 WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Attached to Kelly's August 7, 2020, motion are two responses from Warden M.D. Smith of USMCFP Springfield, one dated June 1, 2020, and the other dated June 16, 2020.  The first response indicates that Kelly had previously made a request to the warden for a reduction in sentence based on his medical condition.  The warden responds:

> After careful review of your case, your request has been denied.  While you do have a medical diagnosis, your condition is not terminal and your life expectancy is greater than 18 months.  Therefore, you do not meet the terminal criteria, as stated in Program Statement 5050.50.  Accordingly, you are not appropriate for RIS [reduction in sentence] at the time.

Also attached to the motion is a Request for Administrative Remedy submitted by Kelly on June 8, 2020, which is based primarily on Kelly's concerns about COVID-19, claiming that his "serious heart conditions" make him at heightened risk and eligible for compassionate release.  In response to the Request for Administrative Remedy, Warden Smith states:

> The Cadre Unit Team has conducted a review of this matter.  The review revealed you applied for RIS under the terminal medical criteria, specifically due to potential exposure to COVID-19 in relation to underlying health conditions.

> While you do have a medical diagnosis, your condition is not terminal and your life expectancy is greater than 18 months. Therefore, you do not meet the medical criteria as stated in Program Statement 5050.50, and your concern of being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from prison.

Hence, it appears that Kelly satisfied the exhaustion requirement before filing the current motions. Nevertheless, the court concurs with the warden's assessment that Kelly has not shown that extraordinary and compelling reasons exist to reduce his sentence and release him from confinement at this time.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the

policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

As grounds for relief set forth in his first motion, Kelly states: "Petitioner is diagnosed with Congestive Heart Failure, Coronary Artery disease, High blood pressure, and has shortness of breath, this has caused him to have a heart attack in the year of 2010." In his second motion, Kelly lists his health conditions as "hypertension, Ischemic Cardiomyopathy" and states that "his coronary angioplasty status is at 26%." The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

In the case at bar, Kelly, age 48, attaches limited medical records supporting his health claims, and the Government provides more recent medical records. A review of Kelly's Presentence Investigation Report ("PSR"), prepared on March 27, 2018, confirms that he has experienced heart problems dating from at least 2010, when he reportedly had a heart attack.

---

need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

Records from a Jackson, Mississippi, hospital reveal that Kelly has been diagnosed with congestive heart failure, coronary artery disease, and high blood pressure, and also note that he had a stroke in 2014. While in pretrial detention, he underwent frequent blood pressure and pulse checks because of his diagnosis of hypertension, and he was prescribed a number of medications for his medical conditions. After complaining of chest pains, dizziness, and shortness of breath in January 2017, Kelly underwent a medical evaluation which detected no serious issues, and he was continued on his medications.

A Transfer Summary received from USMCFP Springfield, dated December 11, 2019, lists Kelly's medical diagnoses as hypertension, ischemic cardiomyopathy, low back pain (chronic), coronary artery disease, and gastroesophageal reflux disease (GERD). The document reflects that he is prescribed the following medications: Acetaminophen for chronic low back pain (which apparently began with an automobile accident in 2008); Atorvastatin for high cholesterol that may reduce the risk for heart problems; Carvedilol to treat high blood pressure/heart failure; Plavix, a blood thinner to prevent stroke and heart problems; Ferrous glucomate, an iron supplement; Lasix, a diuretic to treat fluid retention and swelling caused by congestive heart failure; Lisinopril to treat high blood pressure and heart failure; and Potassium Chloride, to treat low blood levels of potassium. The Transfer Summary also reveals that Kelly was examined by a cardiologist in August 2019, noting:

> On 8-28-2019 the patient was seen by cardiologist Donald W. Myears, MD with an impression of stable presumed ischemic cardiomyopathy status-post apparent anteroseptal myocardial infarction in 2010, treated with presumed LAD stenting. Left ventricle ejection fraction of 25% and compensated. Hypertension treated. Prior cerebrovascular accident in 2014 without significant sequela or recurrence. Chronic dual antiplatelet therapy.

The Transfer Summary concludes with the following recommendations:

1. Physical activity:  No restrictions.
2. Diet:  Low salt, low sodium diet recommended.
3. Follow-up care:  Follow-up with chronic care for cardiac, gastrointestinal, and orthopedic.
4. Duty/work status:  Regular duty.
5. Special appliances:  None.
6. Mode of travel:  May travel by any means per Corrections.

A medical record dated October 28, 2019, indicates that Kelly had a general adult medical exam by a physician "without abnormal findings."  On April 15, 2020, Kelly was prescribed additional medications:  Clopidogrel Bisulfate, a blood thinner for ischemic cardiomyopathy in view of his coronary angioplasty status, and Furosemide, a diuretic due to his coronary angioplasty status.  On July 23, 2020, he was prescribed Meloxicam, an anti-inflammatory, as well as physical therapy for low back pain.  Another entry that day regarding his cardiovascular system reports that his heart has a regular rate and rhythm, with normal valve sounds.  On August 6, 2020, Kelly once again saw Dr. Myears, a cardiologist, who recommended that he continue his current medications and to follow up in 12 months.  A medical record dated August 10, 2020, reflects that Kelly was complaining of sharp abdominal gas pains that were also causing low back pain, indicating to the provider that the pain was at 10 on the pain scale.  The provider, however, found that Kelly's vitals were stable, he was afebrile, and he was in no apparent distress, noting "no wincing, grimacing or observable external signs of pain," and concluded that "Inmate's complaints are inconsistent with appearance."  As reflected by a medical record dated August 11, 2020, Kelly was examined by a physician's assistant who observed that he appeared well and noted that, as to his cardiovascular system, he had a regular heart rate and rhythm, with normal valve sounds.  She recorded his blood pressure as 122/85, which, while slightly elevated, is within the high normal range, consistent with pre-hypertension rather than hypertension.  Hence, it appears

that Kelly's medical conditions are stable and are being well-controlled by regular monitoring and medication.

Upon completing an investigation, Probation reached a similar conclusion regarding Kelly's health status. Probation notes that "Kelly's Case Manager confirmed the defendant was diagnosed with Congestive Heart Failure and Hypertension"; however, he "is stable and remains under medical supervision." Probation further reports that Kelly is categorized by the BOP as a Care Level 2 inmate, denoting stable, chronic care, explaining:

> Care Level 2 inmates are stable outpatient individuals who require clinician evaluations monthly to every 6 months.
>
> Their medical and mental health can be managed through routine, regularly scheduled appointments with clinicians for monitoring.
>
> Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time.

In any event, Kelly's heart problems, dating from at least 2010, did not hamper or prevent him from engaging in a series of crimes prior to his arrest in 2016, including his three offenses of conviction. Thus, Kelly's medical condition does not meet the criteria listed in the guidelines. His reported medical afflictions are not terminal (with an end of life trajectory within 18 months), nor do they substantially diminish his ability to provide self-care. BOP records confirm that Kelly is ambulatory, has no medical restrictions on physical activities, is classified as regular duty, and is cleared for food service. Probation further observes that Kelly has served only approximately 26 months, or 30%, of his 180-month sentence of imprisonment. Hence, Kelly has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence. Even if Kelly had provided evidence that he was suffering from such a medical condition, "compassionate release is discretionary, not mandatory,

and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020). Where, as here, the defendant has an extensive criminal history, the district court has discretion to deny compassionate release after weighing the evidence. *Id.* at 693-94.

Kelly's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

Here, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Kelly for any "other" reason. In exercising its discretion, the court also finds that no extraordinary and compelling reasons exist

in relation to Kelly's situation. As of September 7, 2020, the figures available at www.bop.gov list 1 inmate (out of a total population of 1,070) and 4 staff members at USMCFP Springfield as currently positive for COVID-19. The figures also indicate that 4 inmates and 3 staff members have recovered, while no one at the facility has succumbed to the disease. Therefore, although Kelly expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat him, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020))); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No.

3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Thus, Kelly has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to release him from prison.

      The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Chambliss*, 948 F.3d at 693-94. The nature and circumstances of Kelly's three offenses of conviction entail his participation for a number of years in a large-scale, international cocaine and methamphetamine trafficking organization connected to the Sinaloa Cartel, as well as a money laundering operation, that spanned from Mexico through California and Texas and then across the United States. His role in the conspiracy was to supply coconspirators with kilogram quantities of cocaine and gram quantities of methamphetamine from various sources, which was imported from Mexico, for distribution to others in the Eastern District of Texas, the State of Mississippi, and elsewhere. Kelly served as a leader/organizer of the drug-trafficking organization, who was responsible for directing and coordinating the distribution of multi-kilogram shipments of cocaine and methamphetamine throughout multiple states. The investigation by law enforcement revealed that Kelly was a wholesale distributor of kilogram quantities of cocaine and had been since as early as 2001. He subsequently became involved in the distribution of methamphetamine. A coconspirator initially supplied Kelly with kilogram quantities of cocaine and methamphetamine, who utilized couriers to deliver large shipments of the drugs to Mississippi. Upon the coconspirator's arrest,

Kelly obtained cocaine and methamphetamine directly from a source of supply in Mexico and continued to do so after the coconspirator was released from state prison. The investigation further revealed that Kelly purchased multiple real properties in Mississippi and a vehicle using proceeds from narcotics transactions.  Kelly was ultimately held responsible for 450 kilograms of cocaine and 409.7 net grams of methamphetamine (actual) for guidelines purposes.  Although Kelly was allowed to plead guilty to all three offenses pursuant to a binding plea agreement that called for concurrent sentences of 180 months' imprisonment, his guidelines range in Case Nos. 4:15-CR-207(11) and 4:17-CR-221(1) was 324 to 405 months, and in Case No. 4:17-CR-222(1), it was 240 months.

Kelly has an extensive criminal history dating back to age 19, including prior convictions for sale of a controlled substance (cocaine), manslaughter (reduced from murder), possession of drug paraphernalia, and reckless driving.  Kelly's term of probation for selling cocaine was revoked when he committed the offenses of manslaughter and possession of a firearm by a convicted felon, failed to report to the probation office as directed, provided a urine specimen that was positive for marijuana, and failed to avoid injurious or vicious habits by testing positive for marijuana.  The charge of manslaughter stemmed from an altercation with a fellow player while playing basketball in which Kelly fatally shot the victim in the back with a pistol the following day while also shooting at the victim's friends.  He was initially charged with murder, but he ultimately pleaded to the lesser charge of manslaughter.  In the PSR, Kelly is identified as a high-ranking member of the Gangster Disciples street gang.  Kelly also has a long history of poly-substance abuse (alcohol, marijuana, Xanax, hydrocodone, and codeine) dating from age 13, including the daily use of alcohol, marijuana, Xanax, and hydrocodone up until his most recent

arrest. Under the circumstances, the court cannot conclude that Kelly would not pose a danger to the safety of any other person or to the community, if released from confinement.

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. To date, the BOP has placed 7,636 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020). The BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Castillo*, 2020 WL 3000799, at *3; *see United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement.").

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public,

meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020)). Here, Kelly's track record is similarly a poor one.

In short, Kelly has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 2020 WL 1940570, at *4-5 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every

prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 2020 WL 1940570, at *5.

III. Conclusion

In accordance with the foregoing analysis, Kelly's Motion for Compassionate Release/Reduction in Sentence/Home Confinement Due to the Emergency of the COVID-19 Virus (#485) and his Motion for Compassionate Release/Reduction in Sentence Due to the Emergency of COVID-19 (#486) are DENIED.

SIGNED at Beaumont, Texas, this 8th day of September, 2020.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE